IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| R.C., a minor, by and through his mother and next friend, LAUREN OHLINGER<br>8611 Knottingham Drive<br>Kissimmee, Osceola County, Florida 34747<br><br>       Plaintiff<br><br>v.<br><br>BALTIMORE WASHINGTON MEDICAL CENTER, INC.<br>301 Hospital Drive<br>Glen Burnie, Anne Arundel County, Maryland  21061<br><br>       Serve On:<br>       University of Maryland Medical System Corp. c/o Office of the General Counsel<br>       250 West Pratt Street, 24th Floor<br>       Baltimore, Maryland 21201<br><br>       Defendant | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Civil Action No.:_____<br><br>JURY DEMAND |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**COMPLAINT**

Plaintiff, R.C., by and through his mother and next friend, Lauren Ohlinger, and by and through his undersigned counsel, Keith D. Forman, Cecilia I. Lavrin and Wais, Vogelstein, Forman & Offutt, LLC, hereby sues the Defendant, Baltimore Washington Medical Center, Inc, and for his causes of action state as follows:

**JURISDICTION AND VENUE**

1.      This medical malpractice claim was instituted pursuant to Md. Cts. & Jud. Proc. Art. §§ 3-2A-01 – 3-2A-10, for the recovery of damages in excess of Thirty Thousand Dollars ($30,000.00). The Request for Waiver of HCADRO and Order of Transfer are attached.

2. Attached hereto and incorporated herein by reference is the Certificate of Qualified Expert and Expert Report of Alan Nager, M.D. The Plaintiff avers that he has satisfied all conditions precedent to the filing of this lawsuit, including the filing of a Statement of Claim, Certificate of Qualified Expert, Expert Report, and Waiver of Arbitration in the Health Care Alternative Dispute Resolution Office of Maryland.

3. Jurisdiction is proper in this Court due to diversity of citizenship as set forth in 28 U.S.C. §1332.

4. Venue is proper in the Northern Division of this district because the acts and omissions giving rise to this Complaint occurred in Anne Arundel County, Maryland.

## PARTIES

5. The minor Plaintiff, R.C. (DOB - December 21, 2012), is a citizen and resident of the State of Florida.

6. Lauren Ohlinger, who is the mother and next friend of R.C., is a citizen and resident of the State of Florida.

7. Defendant, Baltimore Washington Medical Center, Inc. is, and at all times relevant hereto was, a Maryland corporation engaged in the provision of health care services, including the provision of emergency medicine services and other medical services, to individuals in need thereof. At all times relevant hereto, Baltimore Washington Medical Center, Inc (hereinafter "BWMC") acted directly and/or by and/or through its actual and/or apparent agents, servants and/or employees, including, but not limited to, Elizabeth Fronc, M.D., Sheila Ravendhram, M.D., and Esther Liu, M.D.

8. Elizabeth Fronc, M.D. is a board-certified pediatrician, licensed to practice in the State of Maryland. At all times relevant hereto, Dr. Fronc was acting individually and/or as an actual and/or apparent agent, servant and/or employee of Defendant BWMC.

9.  Sheila V. Ravendhram, M.D. is a board-certified pediatrician, licensed to practice in the State of Maryland. At all times relevant hereto, Dr. Ravendhram was acting individually and/or as an actual and/or apparent agent, servant and/or employee of Defendant BWMC.

10. Esther Liu, M.D. is a board-certified pediatrician, licensed to practice in the State of Maryland. At all times relevant hereto, Dr. Liu was acting individually and/or as an actual and/or apparent agent, servant and/or employee of Defendant BWMC.

11. At all times relevant hereto, the aforementioned Defendant held itself out to the public as a health care provider that would render reasonably competent health care services to those individuals who came under its professional care.

## **FACTS**

12. R.C. was delivered by cesarean section on December 21, 2012 at 33-and 3/7-weeks gestation when his mother Lauren Ohlinger developed a partial abruption of her placenta. At birth, his Apgar score was 8 and 9 and he weighed 4 pounds, 3 ounces. On examination, no abnormalities were found.

13. R.C. was twin B to his sister Hadley, who was, and is, without any physical or cognitive disabilities.

14. After ten uneventful days in the neonatal intensive care unit, R.C. and his sister came home without any apparent medical issues or concerns.

15. Thereafter, R.C. and his sister were seen by their pediatrician and were found to be growing and developing normally.

16. On February 11, 2013, at 5:23 a.m., R.C. was bought to the emergency department at BWMC by his mother, Lauren Ohlinger, with signs and symptoms of a severe

3

respiratory infection and sepsis. He was seven weeks post-delivery and now weighed 8 pounds, 7 ounces.

17.     At the time of his arrival, he was seen and evaluated by Dr. Fronc and an emergency department nurse, Mary. On examination, R.C. had all of the classic signs of sepsis and respiratory failure, including increased work of breathing with wheezing and retractions, abnormal muscle tone, whimpering, hypothermia with a rectal temperature of 34.8 C (94.6 F), and was pallid, poorly responsive and had a delayed capillary refill of 3-5 seconds.

18.     Pulse oximetry was performed at the time of R.C.'s arrival and demonstrated that he was hypoxic with an SpO2 of 71 percent (normal 95 to 100 percent).

19.     An arterial blood gas performed at 5:38 a.m., reported a pH of 7.02 (normal 7.35 to 7.45) and a PCO2 of 61 (normal 35 to 45), which indicated that R.C. was both hypoxic and retaining CO2, a demonstration of ineffective ventilation, oxygenation and circulation.

20.     Dr. Fronc was informed as part of R.C.'s history that he had been diagnosed by his pediatrician on Friday, February 8, 2013, as having a viral syndrome. The weekend prior he had a decreased intake of formula and had become increasingly lethargic. His mother had brought him to the emergency room after finding him pale, limp and cold in his crib at 3:00 a.m. that morning.

21.     R.C.'s white blood count (WBC) returned at 26.3 (normal 5 to 20 K/UL), which along with other signs and symptoms, indicated that he was in septic shock. A test for respiratory syncytial virus (RSV) was reported positive by 6:30 a.m.

22.     Dr. Fronc determined that R.C. was hypothermic, dehydrated, and had impending respiratory failure. R.C. was provided oxygen initially by nasal cannula, and resuscitative efforts were initiated with fluids, medications and rewarming. Antibiotics were started to counter any

bacterial infection. A chest x-ray was performed which showed patchy infiltrates bilaterally consistent with bronchiolitis.

23. Dr. Fronc concluded that R.C.'s "picture" was most consistent with severe RSV bronchiolitis with respiratory failure, dehydration, and possible viral sepsis resulting in metabolic and respiratory acidosis.

24. At 6:30 a.m., R.C. had shown some improvement with treatment, but continued to have substantial work of breathing with significant retractions, some grunting, and diffuse crackles in his lungs. As such, he was in danger of fatiguing and going into respiratory arrest.

25. At 6:35 a.m., Dr. Fronc made the decision that given the critical nature of his signs and symptoms R.C. would require transfer to University of Maryland Medical Center (UMMC) to their pediatric intensive care unit (PICU) and called for emergency transport by University of Maryland Medical System (UMMS) Express Care (hereinafter "UMMS transport team").

26. Despite the knowledge that R.C. was in danger of going into cardiopulmonary respiratory arrest while at BWMC, or while en route to UMMC, Dr. Fronc did not make the decision to have him intubated to take over the work of breathing and prevent him from exhausting. Instead, she placed him on oxygen via continuous positive airway pressure (CPAP) by mask at 7:00 a.m.

27. At 7:05 a.m., Dr. Ravendhran assumed care of R.C. Dr. Fronc made the decision to stay to continue to assist. On examination, Dr. Ravendhran noted that R.C. continued to have deep retractions despite being on CPAP, with oxygen saturations above 95%, a respiratory rate between 34-38 and a heart rate in the 150s.

28. The UMMS transport team arrived on site at 7:36 a.m. An attempt was made at that time to remove the CPAP, with R.C. immediately desaturating and developing increased work of breathing with poor air exchange. A repeat blood gas performed using an i-STAT blood gas analyzer demonstrated that R.C. remained acidotic with a pH of 7.1 and a CO2 of 67.

29. Dr. Ravendhran consulted with Dr. Nan Garber, a pediatric critical care specialist at the UMMC PICU. Based on R.C.'s continuing signs of respiratory distress and his respiratory acidosis, both of which placed him at substantial risk of respiratory failure and cardiopulmonary arrest, the decision was now made to intubate him for transport.

30. Despite R.C.'s small size and critical condition, no call was made to an anesthesiologist to assist with the intubation. Instead, Drs. Fronc and Ravendhran decided to attempt the intubation on their own.

31. At 8:51 a.m., in preparation for intubation, R.C. was sedated with fentanyl, versed and atropine.

32. At 8:58 a.m., he was then given vecuronium, a paralytic agent, paralyzing his ability to breath on his own.

33. At 9:00 a.m., Dr. Ravendhran made the first attempt at performing the intubation of R.C. She noted that the visualized cords appeared edematous. R.C. immediately developed decreasing oxygen saturation with the intubation attempt, which had to be abandoned. Subsequently, bag mask ventilation was started to try to improve his oxygen saturation levels.

34. At 9:08 a.m., Dr. Fronc made the second attempt to intubate R.C. No end tidal CO2 was detected and his oxygen saturations dropped precipitously. The endotracheal tube was discontinued and bag mask ventilation was again employed with R.C.'s oxygen saturations now at 50 percent.

35. By 9:15 a.m., despite continued bag mask ventilation, R.C.'s oxygen saturations failed to improve and epinephrine was administered for the acute bronchospasm that had developed.

36. Subsequent to the second attempt to intubate, R.C. developed bradycardia with his heart rate dropping below 80 beats per minute and he then went into cardiac arrest. Cardiopulmonary resuscitation (CPR) was initiated at 9:20 a.m. with chest compressions and continuing bag mask ventilation.

37. At 9:20 a.m. and 9:25 a.m., respectively, a second and third dose of epinephrine were given due to lack of improvement in his cardiopulmonary condition, with persistent hypoxia due to suspected bronchospasm, and despite the continuous bag mask ventilation.

38. At or around 9:20 a.m., the anesthesia team was finally paged to come to the emergency department to assist with the intubation.

39. Dr. Liu, who had arrived at some time prior to or during the attempted intubations, attempted a third intubation at 9:25 a.m. despite the clear evidence that R.C. now had bronchospasm, probable laryngospasm, and likely had developed further laryngeal inflammation from the two traumatic attempts at intubation. This was, again, without any significant improvement in R.C.'s status.

40. Samir Dalal, M.D., an anesthesiologist, arrived at or round 9:25 a.m., along with two other team members. He noted that R.C.'s oxygen saturation was drifting from the low 30s to single digits. He attempted to intubate twice in short succession with the second intubation being successful at or around 9:31 a.m.

41. Despite the successful intubation, R.C. remained without a pulse and required continuing CPR.

42. After the administration of bicarbonate and epinephrine, at or around 10:09 a.m., greater than 40 minutes after he went into cardiac arrest, R.C.'s pulse returned and steadily increased to the 150s. His oxygen saturation remained hypoxic at 60 percent until albuterol was administered through the endotracheal tube. Subsequently, his oxygen saturation was reported to rise above the 80th percentile and his heart rate climbed to above 150 beats per minute.

43. The transport team from UMMS assumed care of R.C. at or around 10:25 a.m.

44. At 10:40 a.m., he was transported out of the emergency department at BWMC to the UMMC PICU.

45. At the time of his arrival to the UMMC PICU, R.C. was described as obtunded with his pupils being fixed, dilated and non-reactive and with no response to pain[1] by Nan Garber, M.D., the Pediatric Critical Care Specialist. He was re-intubated on arrival due to "inadequate chest movement, desaturation and lack of end-tidal". After examination, Dr. Garber diagnosed R.C. with acute respiratory failure and anoxic brain injury. Post-arrest cooling was initiated to prevent further neurological injury with gradual re-warming thereafter.

46. A pediatric neurology consultation was requested to assess for neurological injury. On examination on February 11, 2013, the neurologists noted that R.C. continued to be unresponsive with his pupils sluggishly reactive. Continuous electroencephalogram (EEG) monitoring did not show seizure activity but was "suppressed." The diagnosis was that R.C. likely had suffered hypoxic-ischemic encephalopathy (HIE) and was at risk for seizure activity.

47. During the next 72 hours, R.C.'s neurological status improved slightly with increased responsiveness and his pupils becoming equal and reactive to light. He was started on total parenteral nutrition to maintain his nutrition status, and antibiotics for pneumonia.

---

[1] When R.C. had been brought to the ED at BWMC at 5:30 a.m. his pupils had been equal, round, and reactive to light, indicating that his brain had not been deprived of oxygen.

8

48. On day four of his admission, a head CT revealed that R.C. had sustained a left transverse venous sinus thrombosis.

49. R.C. remained intubated until February 22, 2013. During the period of time that he was intubated, he required sedation with opioids to prevent him from becoming agitated, resulting in his becoming habituated.

50. On February 24, 2013, R.C. was assessed to be stable enough to be transferred from the PICU to the regular pediatric floor for continuing care. He remained on oxygen by nasal cannula for supplemental oxygen and on methadone, clonidine and morphine to prevent symptoms of opioid withdrawal.

51. R.C. was discharged home in stable condition on March 1, 2013, after having been weaned off of supplemental oxygen, methadone and morphine, but remained on a clonidine patch to alleviate withdrawal symptoms and to begin tapering for opioid withdrawal.

52. In 2014, R.C. and his family moved to Florida. Ronald Davis, M.D., a neurologist, has been following his condition since that time. Based on repeated EEGs and his examination and assessment of R.C., Dr. Davis has diagnosed him with bi-hemispheric anoxic injury, focal epilepsy, developmental and behavioral problems, and mild cerebral palsy.

53. An MRI and diffusion tensor imaging (DTI) study of the brain performed on November 5, 2020, revealed a one centimeter cyst at the left choroidal fissure compressing the superior aspect of the left hippocampus with volume loss involving that area of the hippocampus, a decrease in traceable fiber tracts at the parasagittal frontal lobes with asymmetric decrease in traceable fiber tracts at the left parietal lobes and evidence of gliosis in the left parietal periventricular white matter, which was likely secondary to previous ischemia or trauma.

## Count I
### (Medical Malpractice and Post-Majority Medical Expenses)

54.     Plaintiff repeats, re-alleges, adopts and incorporates by reference the above paragraphs of this Statement of Claim as if fully set forth herein.

55.     In their care and treatment of R.C., the Defendant, acting directly and/or by and/or through its actual and/or apparent agents, servants, and/or employees, owed to Plaintiff the duty to exercise that degree of care and skill which a reasonably competent pediatrician, pediatric emergency medicine specialist, hospital, and/or similar health care provider would have exercised under the same or similar circumstances.

56.     The Defendant, acting directly and/or by and/or through its actual and/or apparent agents, servants, and/or employees, breached the aforesaid duty of care to R.C., and was negligent by:

   a. Failing to timely intubate R.C. in light of the critical nature of his condition;

   b. Delaying the decision to intubate R.C.;

   c. Failing to request the assistance of an anesthesiologist to perform the intubation of R.C.;

   d. Negligently performing the intubation of R.C.;

   e. Failing to appropriately treat R.C.;

   f. Failing to maintain adequate and/or appropriate written policies, procedures and/or protocols;

   g. Failing to appropriately follow written policies, procedures and/or protocols; and

   h. Other negligent acts and/or omissions that may be uncovered during the course of this litigation.

57. As a direct and proximate result of the above-mentioned deviations from the applicable standards of care by the Defendant, R.C. suffered the following injuries and damages:

a. Cardiopulmonary arrest;

b. Hypoxic-ischemic encephalopathy;

c. Brain damage;

d. Multi-organ injury;

e. Seizures;

f. Cognitive delay;

g. Developmental delay;

h. Cerebral palsy;

i. Conscious pain and suffering;

j. Emotional and mental distress;

k. He will be permanently dependent on others for activities of daily living;

l. He has suffered a loss of earnings; and

j. He has suffered significant medical and other care expenses that we will be incurred from the age of his majority through the end of his life expectancy.

### Count II
### (Pre-Majority Medical Expenses)

58. As a direct and proximate result of the negligence enumerated in Count I, *supra*, R.C. has suffered significant past medical expenses, and will continue to incur significant medical and other care expenses through the age of majority.

59. Pursuant to *Hopkins v. Pepper*, 346 Md. 679 (1997), R.C. is entitled to recover these expenses due to his financial inability to pay for his extraordinary medical expenses

occasioned by the Defendant's negligence, and due to Ms. Ohlinger's financial inability to pay such expenses.

60. Ms. Ohlinger is a single mother of two children, including R.C., a student herself, and has limited income.

61. Ms. Ohlinger's primary income is derived from Social Security payments she receives on behalf of R.C.

62. To date, R.C.'s extraordinary medical expenses have been predominantly paid for through "government assistance programs", such as Medicaid. *Pepper*, 346 Md. at 701.

63. At present, Ms. Ohlinger's living expenses exceed her income from all sources, including those from government assistance programs.

64. Given R.C.'s diagnoses of brain damage, developmental delay, cognitive delay and cerebral palsy, R.C.'s extraordinary medical expenses occasioned by the Defendant's negligence will far exceed the available financial resources available to R.C. and Ms. Ohlinger.

65. As the majority of R.C. and Ms. Ohlinger's financial resources are derived through "government assistance programs", specifically Social Security and Medicaid, and as Ms. Ohlinger's living expenses exceed her income from all sources, R.C. and Ms. Ohlinger are unable to pay for R.C.'s extraordinary medical expenses, including past medical expenses and future medical expenses through the age of majority.

66. Accordingly, "[p]ublic policy and justice demand" that R.C. has the "right to recover medical expenses . . . in his own name[.]" *Pepper*, 346 Md. at 696.

WHEREFORE, Plaintiff, R.C., by and through his mother and next friend, Lauren Ohlinger, brings this action against the Defendant for all injuries and damages he suffered and

sustained, and for any other damages to which the Plaintiff is entitled, exclusive of interests and costs, and such other and further relief as may be deemed appropriate.

        Respectfully submitted,

        WAIS, VOGELSTEIN, FORMAN & OFFUTT, LLC.

        s\*Cecilia I. Lavrin*
        Keith D. Forman (Bar # 28349)
        kdf@malpracticeteam.com
        Cecilia I. Lavrin (Bar # 11809)
        cil@malpracticeteam.com
        1829 Reisterstown Road, Suite 425
        Baltimore, Maryland 21208
        (410) 998-3600 (office)
        (410) 998-3680 (facsimile)
        *Attorneys for Plaintiff*